E-FILED
Monday, 22 June, 2026  03:05:26 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

TRACY S.,

    *Plaintiff,*

v.

FRANK BISIGNANO, Commissioner of
Social Security,

    *Defendant.*

Case No. 1:25-cv-01415-JEH-RLH

## REPORT & RECOMMENDATION

Plaintiff Tracy S. ("Tracy") filed this suit to challenge an administrative law judge's finding that she was not disabled under the Social Security Act and thus ineligible for benefits. This case has been referred for a Report & Recommendation. Because the Court finds the Commissioner's decision supported by substantial evidence, the Court recommends that it be affirmed.

## LEGAL STANDARD

### I.    The Social Security Act

The Social Security Act—and the regulations adopted under it—explain in detail who is eligible to receive social security benefits. To qualify, a claimant must be sixty-five years of age, blind, or disabled. 20 C.F.R. § 416.202(a)(1)–(3). A claimant is disabled if she cannot "do any substantial gainful activity" because she suffers from "any medically determinable physical or mental impairment" that is either life-threatening or chronic. 42 U.S.C. § 423(d)(1)(A).

To implement that definition, the Social Security Administration has developed a five-step evaluation process. *See* 20 C.F.R. § 416.920(a)(1). The steps proceed sequentially:

**Step One.** Is the claimant currently engaged in substantial gainful activity?

**Step Two.** Does the claimant have a severe mental or physical impairment—i.e., an impairment that significantly limits their ability to do basic work activities—or a combination of them?

**Step Three.** Does the mental or physical impairment appear on an enumerated list (called "listings")? If not, is it nonetheless medically equal to one of those listings?

**RFC Assessment.** What is the claimant's residual functional capacity (RFC)—that is, the most they can still do despite their limitations?

**Step Four.** Based on the claimant's RFC, can they perform their past work?

**Step Five.** Based on the claimant's RFC, can they perform other work?

*See id.* § 416.920(a)(4)(i)–(v). The ALJ begins, of course, at step one. If it yields an affirmative answer (i.e., the claimant is working), the claimant is not disabled, and the inquiry ends. If step two yields a negative answer (i.e., the claimant does not have a severe impairment), the claimant is not disabled, and the inquiry ends. *See id.* §416.920(a)(4)(i)–(ii). Step three, however, is dispositive: If the claimant's impairment appears on a listing, the claimant is considered disabled and eligible for benefits. *See id.* § 416.920(a)(4)(iii). If the claimant's impairment does not appear on or medically equal a listing, the ALJ crafts an "RFC Assessment," which analyzes "the claimant's ability to do physical and mental work activities on a regular and continuing basis despite limitations from [their] impairment." *Moore v. Colvin*, 743 F.3d 1118, 1121

2

(7th Cir. 2014). If either steps four or five yield an affirmative answer (i.e., the claimant can perform their old job or adjust to a new one in light of the RFC), the claimant is not disabled. *See* 20 C.F.R. § 416.920(a)(4)(iv)–(v).

The claimant has the burdens of production and persuasion through step four. *See Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022). At step five, the burden shifts to the Commissioner to show that the claimant can engage in some type of substantial gainful employment. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

## II.    Standard of Review

A court's function on review is limited to determining whether the ALJ's findings are supported by substantial evidence and based upon proper legal criteria. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). Substantial evidence, in turn, is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (explaining that the threshold "is not high"); *Schneck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) ("Substantial evidence may be less than the weight of the evidence, and more than a scintilla." (citation modified)). Yet, while the ALJ's decision commands deference, courts may not simply "rubber stamp" it. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

The Seventh Circuit has emphasized that ALJs are "subject to only the most minimal of articulation requirements" and "need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024). Instead, ALJs need only "provide an explanation for how the evidence leads to their conclusions that is 'sufficient to allow . . . a reviewing court, to assess the validity of the agency's ultimate findings and afford [the plaintiff] meaningful judicial review.'" *Id.* at 1054 (alteration in original) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014)). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary"—not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). Therefore, courts reviewing for substantial evidence may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [their] judgment for the ALJ's determination so long as substantial evidence supports" the decision under review. *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). In short, the ALJ must build "an accurate and logical bridge" between the evidence in the record and his conclusions. *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013).

## BACKGROUND

### I.    Tracy

Tracy was born in 1969, (R. at 197[1]), and has completed her high-school education, (R. at 221). She previously worked as an assistant bookkeeper at a rehabilitation facility and as a bus monitor for a school district. (R. at 221.) On a function report that Tracy completed as part of her application process, she claimed that she cannot stand for long periods of time, that she experiences numbness in her left side, that she cannot carry much weight, and that she walks with a limp. (R. at 240.) She also claimed that, sometimes, she has trouble comprehending and remembering information. (R. at 240.) In the summer of 2022, Tracy suffered a stroke and was hospitalized for two weeks. (R. at 616.) Following her time in the hospital, Tracy began outpatient physical therapy. (Pl. Br. 3.[2])

### II.    Procedural History

Tracy applied with the Social Security Administration in July 2022, alleging that she has been disabled since June 30, 2022—the day of her stroke. (R. at 16.) Her application was initially denied in April 2023 and denied upon reconsideration that October. (R. at 16.) She then requested a hearing before an ALJ, (R. at 20), which took place in June 2024, (R. at 43). Present at the hearing were Tracy, her attorney, and a vocational expert. (R. at 43.)

---

[1] "R." refers to the Certified Administrative Record filed on November 26, 2025. (Doc. 5.) The page numbers cited in this R&R refer to the black page numbers at the bottom right of each page of the transcript rather than the green page numbers generated automatically by CM/ECF at the top right.
[2] "Pl. Br." refers to Tracy's opening brief, filed March 11, 2026. (Doc. 8.)

After the hearing, the ALJ issued a written opinion concluding that Tracy was not disabled and therefore not entitled benefits. (*See* R. at 16–37.) In response, Tracy sought review of the ALJ's decision with the Appeals Council, but her request was denied. (R. at 1.) Tracy then filed a complaint in this Court to challenge the ALJ's decision. (Doc. 1.) She filed her brief six months later, (Doc. 8), and the Commissioner responded, (Doc. 14).

### III.   The ALJ's Decision

In his opinion, the ALJ used the five-step evaluation process outlined above to determine whether Tracy was disabled. At step one, he determined that Tracy has not engaged "in substantial gainful activity" since June 30, 2022—the date Tracy alleged that she became disabled. (R. at 19.) At step two, the ALJ found that Tracy had one severe impairment: "stroke with vascular insult to the brain." (R. at 19.) At step three, the ALJ concluded that Tracy's impairment did not meet or medically equal any of the listed impairments. (R. at 23.) Before proceeding to steps four and five, the ALJ crafted the following RFC assessment:

> [Tracy] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she could never use ladders, ropes, scaffold. She could occasionally use stairs and ramps, crawl, and balance on uneven ground. She could have no more than frequent handling and fingering bilaterally. She should avoid hazards such as unprotected heights and moving mechanical machinery. She would be limited to simple and routine tasks. She could sit for up to 10 minutes out of every hour, and would be off task 5 percent of the workday.

(R. at 24.) At step four, the ALJ found that Tracy was able to perform her past work as a bus monitor. (R. at 36.) Based on the ALJ's conclusion at step four, he determined that Tracy is not disabled. (R. at 37.)

## DISCUSSION

Tracy makes three primary points. First, she argues that the ALJ impermissibly "substitute[d] his own lay opinion about the significance of the raw medical data contained in the record." (Pl. Br. 11.) Maybe so. But the evidence in question—a single MRI—did not constitute a line of evidence contrary to the ALJ's conclusion, particularly where the ALJ addressed an abundance of other evidence related to the same condition. Second, Tracy contends that the ALJ conflated her improvement over the course of treatment with an ability to perform light work. But the ALJ did not *solely* rely on Tracy's improvement; he merely used it as one factor in concluding that Tracy was not disabled. And third, Tracy asserts that the ALJ failed to explain how he determined her physical RFC, which was inconsistent with the evidence in the record. But the ALJ explained why he included additional restrictions—beyond those of the state-agency consultants—in Tracy's RFC. He thus discharged his responsibility to build a logical bridge from the evidence to his conclusions.

## I.    Whether the ALJ Impermissibly Relied on His Own Interpretation of the Medical Evidence

Tracy observes that the records she submitted to the ALJ reflected "physical and neurological findings and a recent brain MRI showing changes" in her condition. (Pl. Br. 11–12.) But nowhere in those documents, she maintains, were "those findings translated into specific functional abilities that the ALJ could have relied upon." (Pl. Br. 12.) The Commissioner responds that those records *were* translated—namely, by a state-agency consultant who evaluated Tracy's claim on reconsideration. (Comm'r

Br. 3.) The Commissioner also observes that the ultimate responsibility for the RFC is entrusted to the ALJ. (Comm'r Br. 3–4.)

The question is whether the ALJ was required to rely on a doctor to ascribe Tracy the specific limitations contained in her RFC. The answer is no. As the Commissioner observes, "a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014). And the ALJ's responsibility to craft an RFC necessarily entails the responsibility to decide which limitations are properly within it. It reasonably follows that ALJs "need not adopt any one doctor's opinion." *Fanta v. Saul*, 848 F. App'x 655, 659 (7th Cir. 2021) (citing 20 C.F.R. § 404.1527(d)(2)). True, ALJs must "include all of a claimant's limitations supported by the medical record." *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021). But that is not the same thing as asking ALJs to ground each limitation in the RFC to a doctor's suggestion. *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).

These principles foreclose Tracy's argument that the ALJ erred by refusing to wholeheartedly embrace either state-agency opinion. Put another way, the mere fact that the ALJ assigned restrictions not found in either of those opinions does not warrant reversal. Tracy cites *Stephen R.S. v. Commissioner of Social Security*, but that case is different. No. 3:20-cv-1160, 2022 WL 897188 (S.D. Ill. Mar. 28, 2022). There, none of the state-agency consultants even submitted RFC determinations because the claimant had not offered enough evidence for them to do so. *Id.* at *6. To remedy this defect, the claimant "submitted new evidence to the record at the hearing

level," including hospital records. *Id.* But rather than solicit another opinion, the ALJ "evaluated the medical data in those reports himself." *Id.*

Here, by contrast, the state-agency consultants—Dr. Vittal Chapa and Dr. Jennifer Western—*did* submit RFC assessments. (*See* R. at 73–75, 82–83.) And in crafting Tracy's RFC, the ALJ discussed them in considerable depth. (*See* R. at 30–32.) He was only "partially persuaded" by Dr. Chapa's opinion because, among other things, Dr. Chapa limited Tracy to sedentary work; in the ALJ's view, however, the "medical records . . . [were] more consistent with the finding that [Tracy] could" perform light work. (R. at 31.) Instead, the ALJ was "more persuaded" with Dr. Western's opinion—principally because it was "more consistent with the medical records . . . that reflect that [Tracy] is able to perform light work activity." (R. at 32.) Thus, unlike the ALJ in *Stephen*, the state-agency consultants here crafted RFCs on which the ALJ explicitly relied in performing his own analysis.

To be sure, the state-agency consultants did *not* review Tracy's June 2024 brain MRI, which Tracy contends "show[ed] changes" with her condition. (Pl. Br. 12.) In summarizing this MRI, the ALJ recited the impressions of the doctor who performed it—the MRI demonstrated, for example, "scattered T2/11 FLAIR hyperintensities within the puns," and "[l]acunar infarcts" "within the left superior frontal gyrus." (R. at 29.) It goes without saying that these findings are unintelligible to a layperson (or a lawyer); it would take a medical professional to explain them. The Commissioner appears to concede the point but argues that the ALJ did not rely on the MRI to "draw any conclusions about [Tracy's] physical functioning." (Comm'r Br. 5.) In other words,

9

the ALJ acknowledged the MRI but did not explain how—or whether—he considered it in performing his RFC assessment, which is tantamount to not considering it at all. So the question becomes whether the ALJ's failure to incorporate the MRI into his RFC assessment was reversible error. It was not.

ALJs must, of course, "consider all relevant evidence." *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) (quotations omitted). But the failure to do so is *prejudicial* only when an ALJ "ignore[s] an entire line of evidence contrary to her conclusion." *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). The ALJ here did not commit that error. To begin, the ALJ found that Tracy suffered from one severe impairment: the residual effects of her stroke. (R. at 19.) And virtually all the evidence in the record pertained to that condition. In performing his RFC analysis, the ALJ considered that evidence—including much of it that weighed in Tracy's favor. He acknowledged, for example, that Tracy suffered three strokes during the relevant period, (R. at 31); that she experiences "neuropathic pain in her left arm" and other "cognitive deficits" as a result of them, (R. at 29, 31); that Tracy had "gait deviations and decreased gait speed and stance time with her left lower extremity," (R. at 27); and that she "had twitching in the middle finger of her right hand and some diminished pinprick sensations in her bilateral upper extremities," (R. at 32). That said, the ALJ also acknowledged the evidence unfavorable to Tracy. He noted, for instance, evidence that Tracy could walk for sustained periods, (R. at 27); that Tracy's "musculoskeletal strength had significantly improved"; that examinations showed Tracy to be "alert, oriented to person, place, and time, and that she had appropriate

10

thought content," (R. at 35); and that Tracy demonstrated "5/5 strength throughout her bilateral upper and lower extremities," (R. at 32). All told, the ALJ's opinion considered the evidence both favorable and unfavorable to Tracy. He thus concluded, after reviewing the state-agency opinions, that Dr. Western's assessment was the most persuasive because it was "consistent with the medical records . . . that reflect the claimant is able to perform light work activity." (R. at 32.)

Tracy has not shown that the June 2024 MRI undermines that conclusion. She does not argue that the MRI showed findings more severe than the other evidence (much of it favorable to Tracy) that the ALJ *did* consider. (*See* Pl. Br. 11–12.) Nor does she argue that the MRI amounts to a "significant, new, and potentially decisive finding[]" that would have required the ALJ to solicit another medical opinion. *Stave v. Colvin*, 812 F.3d 1121, 1123 (7th Cir. 2016). In short, the ALJ's failure to explain how he factored the MRI into his RFC assessment was not prejudicial error.

## II. Whether the ALJ Conflated Tracy's Improvement with an Ability to Perform Light Work

Tracy's second argument fails for similar reasons. She observes—correctly— that "improvement" is a relative term. The mere fact that a claimant's conditions have improved is therefore not enough to find them capable of performing light work. (Pl. Br. 12 (quoting *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).) Tracy argues that the ALJ ignored this principle when he relied upon her improvement in performing his RFC analysis. (*See* Pl. Br. 12–13.) But, as the Commissioner observes, the ALJ did not solely rely on Tracy's improvement; it was merely one factor that he considered in concluding that Tracy could perform a range of light work.

To begin, the ALJ's opinion indeed makes several references to Tracy's improvement in her condition. (*See, e.g.*, R. at 34 ("[T]he treatment record shows improved functioning in terms of the claimant's strength in her extremities . . . ."); R. at 31 ("Treatment notes documented that the claimant's gait has significantly improved with physical therapy."); R. at 29 ("[T]he claimant reported that Warfarin helps improve her symptoms."); R. at 27 ("Treatment notes documented that the claimant's musculoskeletal strength has significantly improved.").) Tracy argues, however, that the relevant question is not whether she has improved, "but whether [she has] improved enough to meet the legal criteria of not being classified as disabled." (Pl. Br. 12 (quoting *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014).) That is true as far as it goes. But the ALJ relied on more than the mere fact of Tracy's improvement in concluding that she could perform light work. He cited, for instance, examinations that showed Tracy's symptoms were stable on medication, (R. at 28); treatment notes that showed Tracy "had a range of motion in her extremities within normal limits" and "5/5 strength in her bilateral upper and lower extremities," (R. at 27); and evidence showing that Tracy did not require the use of an assistive device for mobility, (R. at 33). Thus, the ALJ relied on Tracy's improvement *along with* other factors—like treatment notes and medication—in performing his RFC analysis. *See* 20 C.F.R. § 416.929(c)(3) (explaining that ALJs are required to consider, among other things, "the type, dosage, effectiveness, and side effects of any medication the claimant takes" and "treatment, other than medication, the claimant receives or has received for relief").

Tracy relies on *Murphy v. Colvin*, but that case exposes the flaw in her argument. There, the court found "no evidence to suggest" that the claimant "had improved to the point where she could perform light work." 759 F.3d at 819. Not so here. The ALJ explicitly documented the evidence—besides Tracy's improvement—that supported his conclusion that she could perform light work. Because courts may "not reweigh the evidence," *Gedatus*, 994 F.3d at 900, this Court must decline Tracy's invitation to second-guess the ALJ's conclusion.

Tracy also observes that the ALJ "cited some of Dr. Tokola's February 2024 exam findings seemingly as support that [her] stroke residuals had improved and that she could perform light work." (Pl. Br. 12.) But, on her telling, the ALJ "failed to acknowledge the exact came record" also suggested that Tracy should consult a physical therapist for balance issues and falls. (Pl. Br. 12.) The ALJ's "failure to acknowledge these findings" and "completely ignore probative evidence warrant remand on its own." (Pl. Br. 12.)

The Court disagrees. For one thing, nothing in the Social Security Act or the regulations says that ALJs must rely only on evidence that points in one direction. Nor would such a requirement be wise: evidence may—and often does—support more than one conclusion. But "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the" ALJ. *Herr*, 912 F.2d at 181. For another, the ALJ explicitly acknowledged that Tracy experiences residual symptoms from her strokes that limit her ability to work. Indeed, the ALJ said precisely that: He "included additionally [sic] limitations

13

in [Tracy's] residual functioning capacity that she could only frequently handle and finger bilaterally due to residual effects of the claimant's stroke." (R. at 32.) The ALJ also recognized that Tracy has undergone physical therapy in the aftermath of her stroke. (*See, e.g.*, R. at 26 "[Tracy] reported that her left sided weakness has improved with physical therapy although she has some impairment in her gait."); R. at 26 ("Treatment notes documented improved functioning with physical therapy.").)[3]

Accordingly, the fact that the ALJ did not cite every piece of evidence related to the effects of Tracy's stroke does not warrant reversal. *See Warnell*, 97 F.4th at 1053 (explaining that ALJs "need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning").[4]

## III. Whether the ALJ Articulated the Reasons for His Specific Restrictions

Finally, Tracy argues that the ALJ "never explained *how* he determined" the physical limitations in her RFC, "despite her left lower extremity symptoms and

---

[3] In her reply, Tracy argues that the Commissioner violates the *Chenery* doctrine when he argues that the "failure to discuss post-stroke physical therapy records was harmless because their objective findings did not undermine the ALJ's findings." (Pl. Reply 2.) The Court disagrees. Although the Commissioner cannot defend the ALJ's opinion on grounds that the ALJ did not embrace, *see SEC v. Chenery Corp.*, 318 U.S. 80 (1943), Tracy bears the burden of demonstrating that the ALJ's opinion lacked substantial evidence. And Tracy cannot carry that burden simply by observing that the ALJ did not discuss some of the evidence in the record. Instead, she must show that the ALJ ignored *a line of evidence* contrary to his conclusion. For reasons stated, Tracy has not done so.

[4] Citing the record, Tracy also accuses the ALJ of "completely ignor[ing]" some "objective evidence undermining the ALJ's finding that [she] could meet the walking and/or standing demands of light work or safely balance or use stairs and ramps." (Pl. Br. 13 (citing R. at 1804–05).) But as the Commissioner observes, that portion of the record does not support her charge. Indeed, those pages appear to be two documents from a rehabilitation clinic: the first is computer generated and contains unspecified field codes, (R. at 1084); the second is a report that shows the two interventions that Tracy completed on March 27, 2024, (R. at 1085). Neither document says anything about Tracy's diminished ability to walk, stand, or balance.

balance issues." (R. at 13.) But the ALJ's duty is limited to constructing an "accurate and logical bridge from the evidence to [his] conclusion" such that a reviewing court may "afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

The ALJ here discharged that responsibility. Indeed, after finding persuasive Dr. Western's conclusion that Tracy could perform light work, the ALJ explained why he prescribed additional limitations. He explained that he included limitations on Tracy's ability to "handle and finger bilaterally" because those limitations were consistent with Tracy's (1) complaints of "intermittent numbness in her left arm" (2) reports that "her right hand is jumpy and . . . moves on its own," and (3) "twitching in the middle finger of her right hand" and diminished sensation in her arms. (R. at 32.) The ALJ also limited Tracy to "simple and routine tasks" based on the "cognitive limitations due to the sequela of her stroke." (R. at 32.) Accordingly, the ALJ explained that the record, as a whole, supports a finding that Tracy could perform light work, but he included additional limitations based on the residual symptoms that he found supported by the record. That is precisely the "logical bridge" he was required to construct. *Scott*, 297 F.3d at 595.

Tracy's other arguments are unavailing. She argues that the RFC was inconsistent with her own testimony. But the ALJ expressly found that Tracy's testimony was "not entirely consistent with the medical evidence and other evidence in the record." Because ALJs need only include restrictions that are "supported by the medical record," he was not required to accommodate the portions of Tracy's

15

testimony with which he disagreed. *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021). Tracy also argues that "no medical opinion link[ed] the medical evidence with the RFC limitations." (Pl. Br. 14.) But as discussed, *see supra* Part I, ALJs need not tether their RFC findings to any one doctor's opinion—the RFC determination was his alone to make.

## CONCLUSION

IT IS THEREFORE RECOMMENDED that the Commissioner's decision be affirmed. The parties have fourteen days from service of this Report and Recommendation to object to it. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). By failing to timely object, the parties will waive their right to do so. *See Goyal v. Gas Tech. Inst.,* 389 Fed. App'x 539, 543 (7th Cir. 2010).

*So recommended.*

Entered this 22nd day of June 2026.

s/ Ronald L. Hanna
Ronald L. Hanna
United States Magistrate Judge

16